UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NANCY P. CARRIGAN,<br>Plaintiff,<br><br>v.<br><br>NORMAN Y. MINETA, SECRETARY OF TRANSPORTATION, DEPARTMENT OF TRANSPORTATION and FEDERAL AVIATION ADMINISTRATION.,<br>Defendants. | Civil Action Docket No.<br><br>CA 06 197 S |

**COMPLAINT AND JURY DEMAND**

**Parties**

1. Plaintiff Nancy P. Carrigan is an individual residing at 15 Leslie Road, Worcester, Massachusetts, and a former employee of the Federal Aviation Administration located in Warwick, Rhode Island.

2. Defendant Norman Y. Mineta is the United States Secretary of Transportation.

3. Defendant Department of Transportation is a United States Government Agency with a location in Warwick, Rhode Island.

4. Defendant Federal Aviation Administration is a United States Government Agency under the authority and control of the Department of Transportation, with a location in Warwick, Rhode Island.

**Jurisdiction**

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

6. Plaintiff filed her claims of sex discrimination, sexual harassment and unlawful retaliation pursuant to applicable federal laws with the United States

Equal Employment Opportunity Commission on August 18, 2005. Pursuant to Plaintiff's request, her claims were dismissed on January 30, 2006. Plaintiff has complied with all administrative requirements under federal law.

**Facts**

7. Plaintiff Nancy P. Carrigan ("Ms. Carrigan") is a 54 year old woman.

8. Ms. Carrigan was employed by the Federal Aviation Administration("FAA") for over 24 years, from August 1981 until her termination from employment effective January 3, 2006, as a Certified Professional Controller("CPC").

9. Over the years, Ms. Carrigan received a number of promotions and regular merit pay increases. At the time of her termination, her Grade was ATC-9.

10. Ms. Carrigan consistently performed her job well for 24 years. She received Letters of Commendation, Time Off Awards, and other awards from her supervisors. A September 2001 award given to Ms. Carrigan states that "this level of excellence borders perfection."

11. At the time of her termination Ms. Carrigan worked for the FAA at T.F. Green (Providence) Airport located in Warwick Rhode Island.

12. Ms. Carrigan was one of 5 female air traffic controllers out of a total of approximately 40 in the Warwick FAA location. According to the FAA's Administrator's Fact Book dated November 2004, women comprise 21.6% of employees in the FAA in New England.

13. Ms. Carrigan was subjected to ongoing sexual harassment by Gene Wallace, a co-worker who was also a CPC, beginning in or around September 2002.

14. During the period from September 2002 until sometime in April of 2004, Ms. Carrigan was told approximately a dozen different times by her co-workers about sexual comments made by Mr. Wallace about her. Specifically, on these occasions, Mr. Wallace described to Ms. Carrigan's co-workers his sexual dreams of wild nights in the bedroom with Ms. Carrigan. These co-workers repeatedly cautioned Ms. Carrigan not to be alone with Mr. Wallace.

15. At least 3 times a month during 2002 and 2003, Mr. Wallace and Ms. Carrigan were assigned the midnight shift and would be alone together in the building before leaving work. Mr. Wallace would frequently frighten Ms. Carrigan by unexpectedly appearing in the dark in the halls of the building. Mr. Wallace would also lurk in the dark parking lot and shine his automobile's headlights on Ms. Carrigan as she left the building.

16. At least two dozen times during this period, Mr. Wallace closely followed Ms. Carrigan's car on the highway part way home.

17. Ms. Carrigan repeatedly told Mr. Wallace to stop these behaviors, to no avail.

18. Mr. Wallace told Ms. Carrigan that he was moving to Worcester so that he could car pool with her. He told Ms. Carrigan's co-workers that the way to get to Ms. Carrigan was through her mother and that he would make her mother love him.

19. Mr. Wallace frequently addressed Ms. Carrigan as "dear," although Ms. Carrigan asked him on a number of occasions to not do so.

20. Beginning in the summer of 2003, on a frequent basis, Mr. Wallace would put on a headset to listen in while Ms. Carrigan was working. He would

approach Ms. Carrigan from behind, while she was concentrating on her job of monitoring airplanes and maintaining air traffic safety, and say, "I've got my headset on and I am monitoring you." Ms. Carrigan repeatedly asked Mr. Wallace to stop doing this, and she complained to her supervisor Greg Barron, but this conduct did not stop.

21. In or about February or March 2004, in Ms. Carrigan's presence, Mr. Wallace talked about a date he was anticipating. He said that the woman, "has been wanting my body since high school."

22. Mr. Wallace, also known as "Bubba," is from Texas. Mr. Wallace on a number of occasions referred to himself as a "Texas longhorn," and referred to women as "li'l ones." He told Ms. Carrigan, "you have to be used to a Texas longhorn because li'l ones could be hurt by a Texas longhorn."

23. During the time period from 2002 to 2004, Ms. Carrigan repeatedly told Mr. Wallace that his conduct was unwelcome and she asked him to stop.

24. The sexual harassment was severe and pervasive and made it increasingly difficult for Ms. Carrigan to do her job.

25. On April 19, 2004, Ms. Carrigan complained to Acting Manager Lindsey Adrain about the sexual harassment to which she was subjected by Mr. Wallace. Ms. Carrigan told Ms. Adrain that Mr. Wallace's behavior was adversely affecting her and that she wanted management to put a stop to it.

26. On or about April 24, 2004, Ms. Carrigan's supervisor Greg Barron told her that he thought Mr. Wallace was just a Southern gentleman, and that management would handle the situation "in house."

27. Ms. Carrigan asked Mr. Barron that Mr. Wallace not be assigned to the same shift as hers. Mr. Barron said he would talk to Mr. Wallace, but Mr. Barron took no action to separate Mr. Wallace from Ms. Carrigan, and did not discipline Mr. Wallace other than asking him to apologize for "scaring" Ms. Carrigan.

28. Despite Ms. Carrigan's complaints to management, the incidents of sexual harassment continued.

29. On or about May 28, 2004, while Ms. Carrigan was on the job controlling an aircraft that was taxiing, Mr. Wallace grabbed and held on to her upper thigh. Ms. Carrigan was extremely alarmed and snapped at him to "knock it off."

30. On June 8, 2004, Ms. Carrigan was leaving work after midnight to go home. Mr. Wallace sat in a dark hallway and exclaimed "I have been waiting for you" when she walked by.

31. On June 10, 2004, National Air Traffic Controllers Association ("NATCA") President, Bruce Miller and Ms. Carrigan met with Assistant Air Traffic Manager Deborah James. Ms. Carrigan complained to Ms. James about the two additional incidents of sexual harassment on May 28th and June 8th, and she asked that Mr. Wallace's schedule be changed immediately.

32. Ms. Carrigan was very upset and afraid, and she explained to Ms. James that her concerns were simply not being addressed "in house." Ms. Carrigan asked that the Accountability Board in Washington DC be notified of her situation. (Ms. Carrigan was later told by EEO Counselor Mike Bencal that the Accountability Board opened and closed her case on June 10, 2004).

33. Ms. James told Ms. Carrigan that Mr. Wallace and she would no longer be assigned to work together. Even after the June 10th meeting with Ms. James, however, Mr. Wallace and Ms. Carrigan were still scheduled to work together.

34. Mr. Wallace now appeared angry around Ms. Carrigan and he would slam doors and slam objects in her presence.

35. Ms. Carrigan again complained to Ms. James and was assured that Mr. Wallace and Ms. Carrigan would not to be scheduled to work together any more.

36. Nonetheless, Ms. Carrigan's supervisor Greg Barron still assigned Mr. Wallace to work in close proximity with Ms. Carrigan.

37. Again, in or around mid-July, Ms. Carrigan spoke to Ms. James and was assured again that Mr. Wallace and Ms. Carrigan would not be assigned to work together at any time and that Ms. James would talk to Mr. Barron.

38. Despite Ms. James' assurances, however, Mr. Wallace was still scheduled to work with Ms. Carrigan. In fact, Mr. Wallace and Ms. Carrigan were assigned to work in close physical proximity 42 times during the period from June 10, 2004 through September 16, 2004.

39. On September 2, 2004, while Ms. Carrigan was working Departure Radar, Mr. Wallace surprised her from behind and announced "I have my headset on and I am monitoring you." This intrusion upset Ms. Carrigan enormously.

40. Later that day, Operation Supervisor Scott Smith, informed Ms. Carrigan of a problem with two airplanes that had been under her control. This problem had occurred shortly after Mr. Wallace was "monitoring" Ms. Carrigan. It

was determined that the planes crossed with 4.2 miles separation (3 miles apart is the minimum separation).

41. Although this was not an error, Mr. Barron later told Ms. Carrigan that she was not allowed to work any radar position until she had an "over the shoulder" with him. Mr. Barron assured Ms. Carrigan that she was not decertified and union officials were briefed that I was not decertified.

42. On September 4, 2004, however, Mr. Barron told Ms. Carrigan that she was decertified from all radar positions.

43. On September 14, 2004, Ms. Carrigan received a memorandum from Mr. Barron stating she was decertified on all radar positions based on "documented performance deficiencies." The letter listed 3 occasions of allegedly deficient performance (including the September 2nd incident), along with 1 operational error that had occurred over a year before, in August of 2003.

44. Ms. Carrigan's decertification was discriminatory and constituted retaliation for her complaints of discrimination and sexual harassment. Her record simply did not warrant a decertification.

45. Specifically, the August 2003 operational error had been the *only* error of Ms. Carrigan's entire career as an air traffic controller, and she had received no disciplinary action of any kind for this error when it occurred.

46. With respect to the alleged "documented performance deficiencies" on September 2, 2004, management failed entirely to comply with notification requirements under the NATCA Collective Bargaining Agreement for

disciplinary action. Prior to the decertification, Ms. Carrigan had no knowledge of two of the alleged "documented performance deficiencies" on which her decertification was supposedly based.

47. The September 2, 2004 incident, (the third alleged "documented performance deficiency"), resulted directly from management's failure to take action to separate Ms. Carrigan from Mr. Wallace, as she had requested on numerous occasions.

48. Ms. Carrigan was treated differently from numerous male air traffic controllers who were not decertified even though they made Errors. ("Errors" by definition are more serious than "performance deficiencies.")

49. Ms. Carrigan's decertification was in stark contrast to the lack of discipline given to male air traffic controllers. For example, during the summer of 2004, the following events occurred to these CPC's: One male CPC committed an Error with no decertification; another male CPC committed an Error with no decertification; A third male CPC committed an Error with no decertification; and fourth male CPC committed 2 Errors in one month and was decertified in only 1 sector.

50. By contrast, Ms. Carrigan had committed no error in 2004 and was decertified in all sectors.

51. On September 16, 2004, Ms. Carrigan informed Mr. Barron that she had written to Senator Edward Kennedy to request a Congressional inquiry into the retaliation against her for her complaints of sexual harassment. Ms. Carrigan explained that she was very upset about her unfair treatment and

discrimination, the FAA's complete failure to remedy her sexual harassment and the retaliation she suffered as a result of her complaints.

52. On September 17, 2004, Timothy Merrifield, a co-worker and CPC, told Ms. Carrigan he heard Scott Smith say to a group of employees, "We were just trying to have some fun and then someone went and called their Senator".

53. On September 18, 2004, Ms. Carrigan told Mr. Barron once again that her decertification was discriminatory, unfair and retaliatory. She reminded Mr. Barron that the airplane separation incident on September 2nd occurred soon after Mr. Wallace was "monitoring" her, and she *again* requested that Mr. Wallace not be put on her shift.

54. In response, Mr. Barron stated, "how long is this supposed to go on…he has done nothing wrong….we can't keep you separated…are you telling me that I can't put him next to you?"

**55.** On September 23, 2004, Ms. Carrigan filed an EEO Complaint with FAA Headquarters in Washington, DC.

56. When Mr. Wallace learned about the filing, he searched for Ms. Carrigan at work. When he found her, Mr. Wallace started screaming and grabbed Ms. Carrigan forcefully by her forearm, pulling her toward him. NATCA President Bruce Miller intervened and got Mr. Wallace to let go of Ms. Carrigan.

57. Despite Ms. Carrigan's complaints to management about Mr. Wallace's sexual harassment, Mr. Wallace's framed photo hung on the corridor wall outside of management's offices. No other air traffic controller's photo was

ever displayed in FAA offices. In addition, management submitted Mr. Wallace's name for an award after Ms. Carrigan's complaint was filed.

58. After completion of her remedial training requirements, Ms. Carrign was recertified on October 13, 2004.

59. On October 14, 2004, EEO Counselor Michael Bencal began an investigation of Ms. Carrigan's Complaint. According to Ms. James, the Accountability Board also reopened an investigation at the same time.

60. On or about October 18, 2004, Union President Bruce Miller and Ms. Carrigan met with Mr. H. Cully Beasley, Air Traffic Manager for Providence, regarding of Ms. Carrigan's union grievance. Mr. Beasley was hostile to Ms. Carrigan and told her that he was not moving Mr. Wallace. Mr. Beasley stated, "I am not going to disrupt his life just because you want me to." Ms. Carrigan then informed Mr. Beasley that she would take her case to the EEOC. Only then did Mr. Beasley agree to move Mr. Wallace's schedule.

61. During October through December 2004, Mr. Bencal and Ms. Carrigan met with management to try to resolve Ms. Carrigan's EEO Complaint. However, management refused to agree to permanently separate Mr. Wallace and Ms. Carrigan, and refused to expunge the decertification from Ms. Carrigan's performance record.

62. On January 19, 2005, Ms. Carrigan filed her Complaint of Discrimination in the Federal Government with the Department of Transportation.

63. On April 11, 2005, Mr. Miller told Ms. Carrigan that Mr. Beasley said to him that he refused to continue to separate Mr. Wallace and Ms. Carrigan for the new (2006) schedule. Mr. Miller told Ms. Carrigan that Mr. Beasley said "if Nancy drops her case, we can separate them."

64. The Department of Transportation was supposed to investigate Ms. Carrigan's allegations. The investigator, however, spoke primarily to management personnel and refused to interview two important witnesses who Ms. Carrigan identified to corroborate her claims.

65. A mediation was conducted by the Department of Transportation on July 20, 2005 for the purpose of resolving this unfortunate situation. However, the FAA sent Mr. H. Culley Beasley, Air Traffic Manager for Providence, to represent the Agency. On behalf of the FAA, Mr. Beasley made no effort whatsoever to address Ms. Carrigan's concerns.

66. There were more than twenty occasions after September 16, 2004 when Mr. Wallace and Ms. Carrigan were scheduled to work in the same area. On May 19, 2005, for example, Ms. Carrigan's schedule and Mr. Wallace's directly overlapped. As Mr. Wallace relieved Ms. Carrigan from her shift he said to her, "OK, Nancy, give it up."

67. On August 18, 2005, Ms. Carrigan filed her Amended Complaint of Discrimination in the Federal Government with the U.S. Equal Employment Opportunity Commission.

68. On August 25, 2005, the Providence Journal published a prominent article about Ms. Carrigan's situation and her legal claims, entitled "Green

Controller Files Harassment Claim." In addition, two Providence radio stations covered Ms. Carrigan's case in late August, 2005.

69. On September 13, 2005, Ms. Carrigan was working the arrival sector. Visibility had deteriorated because of haze and we were severely under-staffed with only nine controllers. Ms. Carrigan's supervisor, Kenneth Morse, was next to Ms. Carrigan. He was not wearing a headset to monitor Ms. Carrigan. Instead, he was continuously questioning Ms. Carrigan and giving her orders while she worked. While Ms. Carrigan was responding to one of his questions, she missed a read-back from a pilot, which led to a separation error between two airplanes.

70. FAA Order 7210.56C (Air Traffic Quality Assurance) directs management to view the tape of a session in which an alleged error occurs, for five minutes before and five minutes after the alleged error. However, in Ms. Carrigan's case, management directed the Quality Assurance Supervisor Thomas Mueller to view the tape of her entire shift to look for other errors. As a result, Ms. Carrigan was informed, two additional "errors" were discovered during her shift on September 13, 2005.

71. The two additional alleged "errors" that were found were minor in nature. In fact, they are the sort of minor incidents that occur frequently. No other CPC in Providence has ever had an error called for either of these types of incidents. (One was a "wake turbulence" incident; the other was a "class charlie" incident.) Moreover, with respect to the "class charlie" incident,

Ms. Carrigan did exactly what she was instructed to do by her supervisor Mr. Morse.

72. Nonetheless, Ms. Carrigan was immediately removed from radar duties and, on September 16, 2005, Mr. Morse informed her that she was being put on an Opportunity to Demonstrate Performance ("ODP") Plan.

73. This disciplinary action against Ms. Carrigan was discriminatory and constituted further retaliation against Ms. Carrigan for pursuing her discrimination, sexual harassment and unlawful retaliation complaints.

74. In stark contrast to Ms. Carrigan's treatment, two male CPC's, Jake Crowley and Ted Michalakes had errors on October 10, 2005 and October 19, 2005, respectively, and neither was removed from radar duties for any period of time, decertified, or subject to an ODP.

75. On September 21, 2005, Bruce Miller, President of NATCA and Ms. Carrigan met with Supervisor Edward Angel Quality Assurance Supervisor Thomas Mueller to discuss the alleged errors of September 13, 2005.

76. On October 3, 2005, Ms. Carrigan was given written notification of her decertification and ODP. Mr. Morse told Ms. Carrigan that she had ninety days to prove she could do her job or be demoted, transferred or fired.

77. To date, however, management has failed to interview the two CPC's who worked next to Ms. Carrigan on September 13, 2005 and were witnesses to Mr. Morse's interference with Ms. Carrigan's ability to do her job.

78. On October 17, 2005, Ms. Carrigan was shocked to receive a telephone call from FAA Security and Hazardous Materials Division Investigator Tracy

Schiebel. Investigator Schiebel interviewed Ms. Carrigan on October 20, 2005 regarding FAA management's allegations of "improprieties" during the September 21st meeting.

79. Ms. Carrigan was later informed that she was the subject of the investigation for allegedly "making threats" to management. This charge against Ms. Carrigan was absolutely false. Once again, FAA management was retaliating against Ms. Carrigan for pursuing her claims of discrimination, sexual harassment and retaliation.

80. Ms. Carrigan suffered emotional distress as a result of the Respondents' actions, including, but not limited to, anxiety, insomnia, elevated blood pressure, weight gain, tension headaches and stomach pain. She experienced intense fear, humiliation and embarrassment. She has chronic ulcers and the terrible stress of this situation exacerbated her condition. Ms. Carrigan's primary care physician prescribed medication for insomnia, anxiety, and stomach pain.

81. As a result of severe workplace stress, Ms. Carrigan went out on a medical leave of absence, under the direction of her primary care physician, beginning on or about October 11, 2005. Subsequently, Ms. Carrigan's physician and psychologist recommended against her returning to work from her medical leave.

82. Ms. Carrigan was unable to return to work and subject herself to the excessive stress of the abusive and hostile work environment. She was extremely fearful of further retaliation, including the possibility of

termination which would deprive her of all accrued retirement benefits. With a very heavy heart and deep concern about her financial situation, Ms. Carrigan had no choice but to resign effective January 2, 2006.

83. As a result of the Respondents' unlawful conduct, Ms. Carrigan's damages include, but are not limited to, lost wages and benefits, emotional distress and attorneys' fees and costs.

**COUNT I**
**<u>Sexual Harassment in Violation of Title VII</u>**

84. Plaintiff Nancy P. Carrigan repeats and realleges all allegations contained in Paragraphs 1-83.

85. Ms. Carrigan was subjected to verbal and physical conduct of a sexual nature that unreasonably interfered with her ability to do her job and created an intimidating, hostile, humiliating and sexually offensive work environment.

86. As a result, Ms. Carrigan has suffered pecuniary loss, emotional distress and other damages for which the Defendants are liable.

87. In addition, Ms. Carrigan is entitled to recover punitive damages as well as attorney's fees and costs.

**COUNT II**
**<u>Sex Discrimination in Violation of Title VII</u>**

88. Plaintiff Nancy P. Carrigan repeats and realleges all allegations contained in Paragraphs 1-87.

89. Defendants unlawfully discriminated against Ms. Carrigan in the terms and conditions of her employment and constructively discharged Ms. Carrigan from her employment because of her gender.

90. As a result, Ms. Carrigan has suffered substantial pecuniary loss, emotional distress and other damages for which Defendants are liable.

91. In addition, Ms. Carrigan is entitled to recover punitive damages as well as attorney's fees and costs.

**COUNT III**
**Retaliation in Violation of Title VII**

92. Plaintiff Nancy P. Carrigan repeats and realleges all allegations contained in Paragraphs 1-91.

93. Defendants unlawfully discriminated against Ms. Carrigan, harassed her and constructively discharged her from her employment because she opposed sexual harassment, sex discrimination and unlawful retaliation in the workplace.

94. As a result, Ms. Carrigan has suffered substantial pecuniary loss, emotional distress and other damages for which Defendants are liable.

95. In addition, Ms. Carrigan is entitled to recover punitive damages as well as attorney's fees and costs.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL CLAIMS**

## REQUESTS FOR RELIEF

WHEREFORE, plaintiff Nancy P. Carrigan requests that this Court enter the following relief:

1. Back pay
2. Front pay
3. Lost benefits
4. Emotional distress damages
5. Punitive damages
6. Attorney's fees and costs
7. Any other relief to which plaintiff may be entitled.

Respectfully submitted,

NANCY P. CARRIGAN
By her attorneys,

Raymond A. Marcaccio (#3569)
OLIVERIO & MARCACCIO LLP
55 Dorrance Street, Suite 400
Providence, RI 02903
(401) 861-2900
(401) 861-2922 Fax
ram@om-rilaw.com

Dated: April 28, 2006